Rockingham
No. 85-564

### THE STATE OF NEW HAMPSHIRE

v.

### MARK HOWE

March 5, 1987

*Stephen E. Merrill*, attorney general (*Tina Schneider*, assistant attorney general, on the brief), by the brief for the State.

*Joanne Green*, assistant appellate defender, of Concord, by brief for the defendant.

THAYER, J.   The defendant was convicted after a jury trial in Superior Court (*Manias*, J.) on two counts of aggravated felonious sexual assault in violation of RSA 632-A:2, for which he received two consecutive sentences of 7 1/2 to 15 years in the State prison. On appeal, the defendant claims the trial court erred in denying his motion to suppress out-of-court and in-court identifications of the defendant as products of an unnecessarily suggestive photographic identification procedure. We affirm.

On the morning of May 9, 1984, Patricia DeMaris, a resident of Haverhill, Massachusetts, drove to the Registry of Motor Vehicles in Haverhill to renew her driver's license. When she arrived, a young man was parked in a white car in the registry parking lot playing loud, raucous music on the radio. Once DeMaris had concluded her business, she returned to her car. While in the process of opening her car door, the young man from the white car crept behind her

and held an eight-inch knife to her side. He told her to get into the car. She complied with this request. He got into the car with her, and gave driving instructions that eventually brought the two to a cemetery in Plaistow. Once at the cemetery, the man sexually assaulted DeMaris twice. The two then drove back to Haverhill. The assailant told her that if she reported the incident, he would "carve" her face. This entire sequence of events lasted from approximately 9:45 a.m. to 11:45 a.m.

A week later, the victim reported the crime to the Haverhill police. She provided a description of her attacker to Detective David Hall. Based upon that description, the victim and the authorities drew up a composite picture of the rapist. At a later date, Sergeant James Ryan (also of the Haverhill Police Department) viewed the composite drawing. Sergeant Ryan noticed that the victim's description and the composite picture of her assailant were similar to a photograph of the defendant in a police bulletin of sex offenders recently released from prison. He inquired of the Worcester (Massachusetts) Police Department and learned that the defendant had been arrested there on May 12, 1984. Sergeant Ryan obtained a 1983 photograph of the defendant, placed that in a book of 117 photographs, and asked the victim to examine the photographs. DeMaris proceeded through the photos until she arrived at the defendant's. She stopped, placed her finger on his picture, and said "I would say that's him. He was more gaunt looking, but that's him, if he was more sickly looking." Sergeant Ryan then said, "we think that's the guy" (meaning her attacker), and that he was under arrest in Worcester. The initial photo identification session ended at that point.

After traveling to the Worcester jail and obtaining a photograph of the defendant that was taken on May 14, 1984, Sergeant Ryan called the victim in again and showed her a second array of eighteen photographs. Included in the eighteen was the recent one of the defendant. The victim selected the defendant's picture and said, "That's the guy. There's not a doubt in my mind." Sergeant Ryan and his colleague, Detective Hall, told DeMaris that they thought the defendant was her assailant.

The defendant was tried on two counts of aggravated felonious sexual assault. He filed a pretrial motion to suppress the out-of-court identifications and any possible in-court identification as products of unnecessarily suggestive procedures. The trial court denied the motion. At trial, DeMaris testified to her out-of-court identifications, and made an in-court identification of the defendant as her assailant.

The defendant's contentions on appeal are that (1) the police

statements after each identification session were unnecessarily suggestive; (2) the victim's identification was unreliable and, consequently, the trial court should have suppressed DeMaris's out-of-court identification; and (3) the trial court should also have suppressed the in-court identification as the product of an invalid out-of-court identification procedure, and as lacking an independent source. No State constitutional issue being raised on appeal, we decide this case under the Federal Constitution.

When a defendant challenges the admissibility of identifications based on photo arrays, he has the initial burden to show that the police identification procedures were unnecessarily suggestive. *See State v. Allard*, 123 N.H. 209, 213, 459 A.2d 259, 262, *cert. denied*, 464 U.S. 933 (1983). "Once the police procedures are shown to be unnecessarily suggestive, the State must prove that the identification was nonetheless reliable by clear and convincing evidence." *Id.*; *see Perron v. Perrin*, 742 F.2d 669, 675 (1st Cir. 1984). In order to determine an identification's reliability, we employ the totality-of-the-circumstances test, by which the prejudicial effect of an unnecessarily suggestive identification is balanced against five reliability factors. *Allard*, 123 N.H. at 213, 459 A.2d at 262. The five dispositive factors under the totality-of-the-circumstances test are: (1) the witness's opportunity to view the defendant at the time of the crime; (2) the degree of the witness's attention; (3) the accuracy of the prior description given by the witness; (4) the witness's level of certainty; and (5) the length of time between the crime and the photo identification. *Id.*; *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

The trial court found that the photo identification procedure was not unnecessarily suggestive, but nevertheless applied the totality-of-the-circumstances test and found the out-of-court identifications reliable. For reasons discussed below, we uphold the finding of reliability of the out-of-court identifications, and consequently need not address the merits of the defendant's argument that the photo identification procedure was unnecessarily suggestive. We thus assume, without deciding, that the procedure was indeed unnecessarily suggestive and need not go further in our analysis. It may, however, be helpful for us to note the problems we see presented by the conduct of the police in this case. Sergeant Ryan's statements of "we think that's the guy," after each session, conveyed the police opinion of the rapist's identity and risked influencing the victim's choice for purposes of the second photo identification session and the in-court identification, respectively. *See State v. Toussaint*, 464 A.2d 177, 180 (Me. 1983) (officer's statement that witness had chosen the "right" man after photo line-up rendered procedure suggestive); *State v. Leclair*,

118 N.H. 214, 219, 385 A.2d 831, 833 (1978). No exigent circumstances existed that would otherwise excuse Ryan's conduct. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967) (probability that victim would not live long necessitated an immediate hospital confrontation).

The State asserts that Sergeant Ryan's statements merely bolstered the victim's confidence in her identification. Yet the bolstering of any identification presents serious dangers of misidentification. The witness will then be predisposed to adhere to this identification in subsequent testimony at trial. In addition, "if the police and the public erroneously conclude, on the basis of an unnecessarily suggestive confrontation, that the right man has been caught and convicted, the real outlaw must still remain at large. Law enforcement has failed in its primary function and has left society unprotected from the depredations of an active criminal." *Manson v. Brathwaite*, 432 U.S. 98, 127 (1977) (Marshall, J., dissenting). Law enforcement authorities must maintain the integrity of the identification process by ensuring that they do not unnecessarily suggest to the witness the individual they want identified.

As indicated, for purposes of this case we may assume that the photo identification procedure was unnecessarily suggestive, because we are nonetheless convinced that the victim's identification was reliable under the totality-of-the-circumstances test established by *Allard*, 123 N.H. at 213, 459 A.2d at 262. We consider each of the five dispositive factors in sequence.

1. *The opportunity to view.* The trial court found that the victim had occasion to observe the defendant in his car twice before the incident. She then spent two hours, during daylight, in close proximity to the defendant. In *State v. Gonzales*, 120 N.H. 805, 806–08, 423 A.2d 608, 609–10 (1982), we upheld an identification's reliability where the victim had approximately one hour to view the defendant at night with light provided by streetlamps. The victim in the instant case had a considerably longer time period, and better luminary conditions, to see the defendant than existed in *Gonzales*.

2. *The degree of attention.* The defendant points to certain factors that allegedly vitiated DeMaris's attention: she was upset, afraid and looking away from her attacker. The trial court found that, despite these circumstances, DeMaris's level of attention was high. Many of the same factors that militate in favor of the victim's opportunity to view also speak in favor of her high degree of attention. DeMaris was no "casual observer" of the rape. *See Biggers*, 409 U.S. at 200. She was the victim of the crime and, as such, her attention was inevitably focused on her assailant.

3. *The accuracy of prior descriptions.* The victim's description of the defendant was highly detailed, including his race, age, hair color and style, eye color, complexion, and clothing. This description was more than sufficiently accurate. *Cf. State v. Gonzales, supra* at 807, 423 A.2d at 609.

4. *The witness's level of certainty.* The trial court found that although DeMaris's first identification was qualified, her qualification was limited to noting a discrepancy between the defendant's sickly appearance at the time of the attack and the more healthy visage exhibited in his photo. The degree of conviction the victim demonstrated, however, was strong enough to contribute to the identification's reliability, and occurred prior to any suggestive statements by the police. Moreover, the witness was absolutely certain that her identification was correct after viewing the second photo array.

5. *The time between the crime and the confrontation.* Three weeks transpired between the rape and the victim's identifications. This time period was longer than the two and eight days (for each identification) that proved acceptable in *Allard*, 123 N.H. at 214, 459 A.2d at 262. Yet, the three-week period in the instant case was also considerably shorter than the seven months that the United States Supreme Court stated "would be a seriously negative factor in most cases." *Biggers*, 409 U.S. at 201. It is unlikely that the victim's recollection would fade during the period of time in question so as to render the identification unreliable.

■ An adequate basis in the record exists to support the trial court's findings on each of the five reliability factors. Therefore, we hold that the trial court could reasonably have concluded that the out-of-court identification was reliable by clear and convincing evidence. Having found the out-of-court identification reliable, we need not determine whether an independent source existed for the in-court identification. *Allard*, 123 N.H. at 212–13, 459 A.2d at 263.

*Affirmed.*

All concurred.